IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MARK WANDERING MEDICINE, HIGH CLUB FOOT, LENARD ELK SHOULDER, CHARLES BEAR COMES OUT, WINFIELD RUSSEL, JAMES DAY CHILD, WOODROW BRIEN, SARAH STRAY CALF, MARTY OTHER BULL, NEWLYN LITTLE OWL, DONOVAN ARCHAMBAULT, ED MOORE, PATTY QUISNO, MICHAEL D. FOX, and PHYLLIS POND CULBERTSON,<br><br>    Plaintiffs,<br><br>vs.<br><br>LINDA MCCULLOCH, GERALDINE CUSTER, ROBERT E. LEE, DOUGLAS D. MARTENS, DANIEL M. SIOUX, SANDRA L. BOARDMAN, CHARLIE KULBECK, M. DOLORES PLUMAGE, FRANK DEPRIEST, DULCE BEAR DON'T WALK, SIDNEY FITZPATRICK , JR., CHAD FENNER, JOHN PRETTY ON TOP, and KIMBERLY YARLOTT,<br><br>    Defendants. | Case No. CV-12-135-BLG-RFC<br><br><br><br><br><br>ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

## I. INTRODUCTION

Plaintiffs are Native Americans from Montana's Fort Belknap, Crow, and Northern Cheyenne Indian Reservations. They ask this Court to Order Defendants to open satellite county offices with in-person absentee voting and late voter registration in Fort Belknap, Crow Agency, and Lame Deer, Montana. Their October 10, 2012 Complaint alleges claims under Section 2 of the Voting Rights Act and the Equal Protection Clauses of the United States and Montana Constitutions. Named as Defendants are Montana's Secretary of State and County officials from the three Montana counties involved.

Twenty-seven days before the 2012 general election, Plaintiffs moved the Court for a mandatory preliminary injunction directing Defendants to immediately open the satellite offices. Plaintiffs did not move for expedited briefing, so a hearing was set on a date convenient for Plaintiffs a few days after Defendants filed their response briefs. On October 30, 2012, after a day and a half of testimony, the motion was denied. This Order explains why.

It is undisputed that it Native Americans living on the three Indian Reservations face greater hardships to in-person absentee voting than residents of the three counties who do not live on the reservations. But because the evidence

also established that Montana law provides several other ways of voting and that Native Americans living on the three reservations are able to elect representatives of their choice, the Court concluded Plaintiffs were not very likely to succeed on the merits their § 2 Voting Rights Act claim. The Equal Protection claims are unlikely to succeed because there is insufficient evidence of discriminatory intent in the decision not to open satellite election offices. When the unlikelihood of success was considered alongside the significant hardship that would be imposed on the County elections administrators to implement new procedures on short notice during what is likely to be a close election in many statewide races, the only reasonable conclusion was that the motion for mandatory preliminary injunction be denied.

### III.   ANALYSIS

#### A.   STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). This is especially true of the mandatory preliminary injunction sought by Plaintiffs. Mandatory preliminary injunctions are particularly disfavored and should not be granted "unless extreme or very serious damage will result." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma*

*GmbH & Co.,* 571 F.3d 873, 79 (9th Cir. 2009).

Plaintiffs seeking a preliminary injunction must establish they are likely to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at, 20. Although all four factors must be met, they operate on a sliding scale. "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.2011). For example, "a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Id.* at 1135.

### B. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS ON ANY OF THEIR CLAIMS

Plaintiffs assert claims based upon Section 2 of the Voting Rights Act of 1965 ("VRA"), 42 U.S.C. § 1973, the Equal Protection Clause of the 14th Amendment to the U.S. Constitution, as well as claims under the Equal Protection Clause found of the Montana Constitution, Art. II, Sec. 4, and the provision of the Montana Constitution guaranteeing free exercise of the right of suffrage, Art. II, Sec. 13. The essence of these claims is that Defendants discriminate against

Plaintiffs by failing to open satellite voting offices so that Plaintiffs can more conveniently register late and cast in-person absentee ballots.

Unlike § 2 of the VRA, discriminatory intent is an essential element of Equal Protection claims alleging discrimination against voters. *Rogers v. Lodge*, 458 U.S. 613, 620-21 (1982). Although a discriminatory purpose can sometimes be inferred from the totality of the relevant facts, *id.* at 618, the direct evidence established that Plaintiffs request was denied because of the significant hardship that would be imposed on election administrators if they had to implement these procedures on short notice in the heat of a presidential election. Plaintiffs argued discriminatory intent could be inferred from the fact that Indians on the reservation have to drive so far to visit the voting office, but the location of the voting office at the county seat was chosen long before there was in-person absentee voting. And the location of the election office at the county seat undoubtedly makes in-person absentee voting harder for many Montanans living in remote sections of Montana's large counties. Accordingly, any circumstantial evidence of discriminatory intent paled in comparison to the direct evidence that satellite locations were denied for logistical reasons. *Id.* Plaintiffs are therefore very

unlikely to succeed on their constitutional claims.[1]

Section 2 of the VRA, 42 U.S.C. § 1973, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). The issue is

---

[1] Although the Montana Constitution provides even more individual protection than the Equal Protection Clause in the Fourteenth Amendment of the Constitution of the United States, *see Snetsinger v. Montana University System,* 104 P.3d 445, 450 (Mont. 2004), Plaintiffs did not brief the applicability of the Montana Constitution, other than to cite the two provisions they claim are applicable. Doc. 4, pp.27-28

whether Plaintiffs can establish, based on the totality of the circumstances, that they, as Native Americans living on the three reservations, have less access to in-person absentee voting and late registration *and* that they are unable to elect representatives of their choice. The plain text of § 1973(b) and the cases applying it require § 2 plaintiffs to prove both unequal access *and* an inability to elect representatives of their choice.² *Gingles*, 478 U.S. at 64; *Chisom v. Roemer*, 501 U.S. 380, 397 (1991) *Gonzalez v. Arizona,* 677 F.3d 383, 405 (9th Cir. 2012); *see also Windy Boy v. Big Horn County*, 647 F.Supp. 1002, 019 (D.Mont. 1986) ("It is axiomatic that if Indian voters are routinely electing candidates of their choice, no violation of Section 2 can be made out. A showing of electoral success can negate findings in favor of plaintiffs on the other [Senate] factors.").

Moreover, Plaintiffs must also prove causation–that the failure to have satellite in-person absentee voting and late registration places has a discriminatory impact on Native Americans. *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012). "Although proving a violation of § 2 does not require a showing of discriminatory intent, only discriminatory results, proof of causal connection

---

²Plaintiffs did not argue or attempt to prove that the failure to have satellite election offices rendered them unable to elect representatives of their choice in their brief (doc. 4) or in the evidence they presented at the hearing. The United States also ignored this element in its statement supporting the Plaintiffs. Doc. 45.

between the challenged voting practice and a prohibited discriminatory result" is crucial ..." *Id.* Said otherwise, a § 2 challenge "based purely on a showing of some relevant statistical disparity between minorities and whites," without any evidence that the challenged voting qualification causes that disparity, will be rejected." *Id.*

In evaluating § 2 claims, courts "must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'" *Gingles*, 478 U.S. at 44. The Senate Report on the 1982 amendments of § 2 contained a list of typical factors which the Court adopted as potentially relevant to, and probative of, a § 2 claim. These "Senate Factors" are not exhaustive and there is no requirement than any number of them be proved. *Gingles,* 478 U.S. at 45. The question of whether the political processes are "'equally open' depends upon a searching practical evaluation of the 'past and present reality.'" *Id.* Based on the evidence admitted on the motion for preliminary injunction and facts generally known within this Court's territorial jurisdiction, the following Senate factors are likely to be relevant in this case:

1. the extent of any history of official discrimination in the state or political subdivision that touches the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

3. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

4. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

5. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous;

6. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*See Gingles*, 478 U.S. at 36-37, 44-45.

First, it is well-established that there has been a history of official discrimination in Montana[3] that has touched the right of Native Americans to participate in the democratic process. *Old Person v. Cooney,* 230 F.3d 1113, 1129 (9th Cir. 2000) (noting that Montana did not contest the district court's finding of

---

[3]Although discrimination within the specific county may also be relevant, the totality of the circumstances test requires the Court to consider official discrimination against Indians by the state and federal government. *Blaine County, Montana*, 363 F.3d at 913.

9

a history of state and federal discrimination against Native Americans); *Windy Boy v. Big Horn County*, 647 F.Supp. 1002, 1008 (D.Mont. 1986) (recounting official discrimination that has hampered the ability of Native Americans to participate in the political process and noting that at the time, no Native American had ever been elected to the County Commission and only one Native American had ever been elected to the school board); *United States v. Blaine County, Montana,* 363 F.3d 897, 900, 913 (9th Cir. 2004) (district court properly took judicial notice from *Old Person* of the history of official discrimination and noting no Native American had ever been elected to Blaine County Commission).[4]

Second, although all three counties previously used at large districts for the election of county commissioners, successful litigation in *Windy Boy, Blaine County, Montana,* and Alden has remedied this problem. And as discussed below, residents of the three reservations have been successful in electing candidates of their choice in recent years.

Third, it was well-established at the hearing, as well as through the Webster Declaration submitted by the United States, doc. 45, ex. 1, that poverty,

---

[4]Northern Cheyenne residents of Rosebud County were also forced to bring § 2 VRA claims to enjoin the at-large county commissioner districts in favor of single-member districts, but Rosebud County agreed to change its procedures before this Court ruled on the merits of the claims. *Alden v. Rosebud County Board of Commissioners,* CV-99-148-BLG-DWM.

unemployment, and limited access to vehicles render it difficult for residents of the three reservations to travel to the county seats to register late and cast in-person absentee ballots. Defendants did not even attempt to argue otherwise.

With respect to the fourth and fifth factors identified above, several of Plaintiffs' witnesses blamed the Secretary of State and the county officials for delaying action on Plaintiffs request. But it was also established that no request was made by anyone to any state or county official for satellite voting offices until May of 2012, when an informal request was made to the private email address of a State Department employee. At this time, the Secretary of State's office was busy preparing for the June 2012 primary. A formal request was not sent to the Secretary of State until July 23, 2012. The issue had never been addressed before and the Secretary of State made a reasonable determination, although later found to be incorrect according to the Attorney General, that Montana law did not allow satellite voting offices. On August 17, 2012, the Attorney General issued a guidance letter advising that satellite voting offices were not expressly prohibited by Montana law and could therefore be instituted at the discretion of the County Clerk and Recorder, with approval from the County Commissioners.

On August 28, 2012, just eleven days after the Attorney General opined that satellite voter offices were not prohibited by Montana law, the Secretary of State

11

issued a guidance document advising local officials how to open a satellite office for in-person absentee voting. Although the Blackfeet Nation had been negotiating with Glacier County and the Secretary of State's office before this, the first request for satellite voting offices in Blaine, Rosebud, and Big Horn counties was not made until mid-September. And the officials from these counties testified that it would have been impossible to comply with Plaintiffs' request for the 2012 election without substantial hardship and the significant possibility of error because Montana law requires that absentee ballots be issued in numerical order and it would be difficult to do so from two locations. Also significant was Ms. Boardman's testimony that the new procedures required by the satellite voting offices would make it impossible to recreate in the event of a recount, which is a real possibility in some of the close statewide contests.

Finally, and most importantly because of the explicit requirement that § 2 plaintiffs prove that the challenged procedure–or lack thereof–results in their inability to elect representatives of their choice, the uncontroverted testimony of defense witnesses proved that Native American residents of the Crow, Northern Cheyenne, and Fort Belknap Indian Reservations are able to elect representatives of their choice. This alone mandates a conclusion that Plaintiffs are not likely to succeed on the merits of their § 2 VRA claim.

Blaine County Clerk and Recorder Sandra Boardman testified that based on her 39 years as an election administrator in Blaine County, voters at the Fort Belknap precincts overwhelmingly favor Democrats. She also testified that all but two of Blaine County's elected officials are Democrats–only one of the three County Commissioners and the County Treasurer are Republicans. Boardman further testified that Delores Plumage is a Native American woman who represents the Fort Belknap Indian Reservation on the Blaine County Commission and that the other Democrat on the County Commission was supported by the tribal council. Finally, Boardman testified that the Fort Belknap Reservation is currently represented by Native Americans in the Montana Senate and House of Representatives.

Big Horn County Commissioner and Crow Tribe member John Pretty On Top testified to the great gains Native Americans had made in getting elected to county and state positions since the *Windy Boy* decision in 1986. He noted that currently seven of nine Big Horn County officials are Native American, as are two state representatives and one state senator from Big Horn County.

Similarly, Defendant Geraldine Custer, the Rosebud County Clerk and Recorder, testified that Rosebud County has one majority Native American County Commission district and that it is currently occupied by Defendant Daniel

Sioux, a member of the Northern Cheyenne Tribe. Custer further testified that only one of the three Montana House districts within Rosebud County is majority Native American and that a Native American man won that seat in 2010. He is opposed by a Native American woman in this year's election, ensuring the seat will continue to be held by a Native American. Also, the state senator from the portion of the County within the Northern Cheyenne and Crow Indian Reservations is also a Native American woman. Finally, Custer testified that based on her 34 years as an election administrator in Rosebud County, the majority Native American precincts overwhelmingly vote for Democrats and that 7 of 11 elected officials from Rosebud County are Democrats.

Since it cannot be disputed that Native Americans on these three Indian Reservations are able to elect representatives of their choice without satellite elections offices for late registration and in-person absentee voting, Plaintiffs § 2 VRA claim is likely to fail.

It is also significant that Plaintiffs could not direct the Court to any cases where Courts ordered similar relief. And the Court's own research revealed no such cases. Plaintiffs repeatedly cited *Operation Push v. Allain,* 674 F.Supp. 1245 (N.D. Miss. 1987), *aff'd sub nom. Operation Push v. Mabus,* 932 F.2d 400, (5th Cir. 1991) as their best case. Although *Operation Push* found a § 2 violation

14

where the failure to require satellite registration on a uniform statewide basis resulted in minority voters having less of an opportunity to vote because the disparate burden of the registration process on minorities, *id.* at 1268, the situation faced by African American voters in 1980's Mississippi is not analogous to the Native American Plaintiffs in this case. First of all, the *Operation Push* court took judicial notice of federal court decisions establishing that African American voters in Mississippi were unable to elect candidates of their choice. 674 F.Supp. at 1252. The hearing testimony showed that this is not the case here.

But more importantly, the only way for the plaintiffs in *Operation Push* to register to vote was to register in person during office hours. Although the Mississippi law at issue provided for the possibility of satellite registration offices, county officials were given discretion as to whether, where, and how long to do so. Specifically, even if the county registrar wanted to allow satellite registration, they had to get permission from the county board of supervisors to remove the hard copy registration rolls out of the office of the county registrar to voting precincts for "such time as [the registrar] may deem necessary." *Id.* at 1250. And in some municipalities, voters had to separately register in two places. *Id.* at 1249. On the contrary, testimony at the hearing established that it is relatively simple for Native American voters in Montana to register to vote without driving to the

15

county elections office. In addition to registration by mail, there was testimony that various organizations had organized voter registration drives on the reservation where applicants filled out voter registration cards that were delivered to election officials. A person who registers by mail or as part of a registration drive could either request an absentee ballot by mail or vote at local polling places on election day. And the counties maintain polling places in each of the three places where Plaintiffs seek satellite offices, as well as in other locations that would be even more convenient for persons who live on the reservation, but far from Fort Belknap, Crow Agency, or Lame Deer. Since these procedures were not available to the *Operation Push* plaintiffs, that case has little application here.

Plaintiffs also cite *Spirit Lake Tribe v. Benson County, N.D.,* 2010 WL 4226614 (D. N.D. 2010) in support of their § 2 claim, but that case is also distinguishable because it did not involve in-person absentee voting at satellite offices, but the decision to close 7 of 8 election day polling places, leaving only one place for tribal members to vote on election day.

In the only case the parties or the Court could find that addressed early voting locations, the federal court in the Middle District of Florida noted that "[w]hile it may be true that having to drive to an early voting site and having to wait in line may cause people to be inconvenienced, inconvenience does not result

16

in a denial of "meaningful access to the political process … [n]or does the Court have the authority to order the opening of additional sites based merely on the convenience of voters." *Jacksonville Coalition For Voter Protection v. Hood*, 351 F.Supp.2d 1326, 1135 (M.D. Fl. 2010).

There being no evidence of discriminatory intent, no showing that Plaintiffs are unable to elect representatives of their choice, and no authority for Plaintiffs' request, the Court must conclude Plaintiffs are unlikely to succeed on the merits of any of their claims.[5]

### C. THE REQUESTED RELIEF WOULD IMPOSE SUBSTANTIAL HARDSHIPS ON DEFENDANTS

The testimony of Sandra Boardman, Blaine County Clerk and Recorder, established that even if the Court were to order Defendants to open the satellite offices immediately, they could not have done so in a satisfactory manner. All three counties would have been required to have secure, ADA compatible facilities and there was conflicting testimony as to whether this could be done in any of the three counties.

Boardman's testimony also established that "Montana Votes," which is Montana's computerized absentee ballot system, is complex and not user-friendly.

---

[5]There are also serious questions as to whether Plaintiffs have alleged the requisite injury in fact and whether the Secretary of State is a proper party to this action. *See* docs. 37 and 52.

Specifically, Boardman explained that because Montana law requires that ballots be numbered and issued in numerical order, satellite offices for in-person absentee and late registration would either have to have: (1) a person who has completed the Secretary of State's training programs and acquired the "C Number" required to access the "Montana Votes" system; or (2), the satellite office would have to contact the main office, acquire the number from the main office, hand write it on the ballot, and ensure that no duplicate numbers are issued. The first option would also require high speed, secure Internet access and additional staff with C Numbers. The testimony was uncontroverted that these counties do not have enough trained employees with C Numbers to staff the satellite offices and that it would be impossible to find and train new staff for this election. The second option would also require a person well-versed in election procedure, although not necessarily with a C Number, who would have to be in frequent contact with the main election office during the busiest time of the four-year election cycle. And significantly, if the second option were employed, it would be impossible to recreate how the ballots were issued in the event of a recount. Neither option is satisfactory.

### III. CONCLUSION

Clearly, the public interest would favor an injunction to promote voting by minorities who suffer from past and present discrimination. Whether the public interest favors a mandatory preliminary injunction at great cost to Defendants so that Plaintiffs can vote in one method when there are several other ways to vote is another matter, but for purposes of this motion, the Court assumes the public interest would favor the relief requested by Plaintiffs. And even if the Court assumes for the purposes of this motion that Plaintiffs are likely to suffer irreparable harm in the absence of an injunction, which was also not clearly established since there are other ways to vote without satellite elections offices, these factors do not outweigh the Plaintiffs unlikelihood of success on the merits or the hardship that would be imposed on Defendants if the motion for preliminary injunction were granted.

Accordingly, consistent with the Order from bench at the close of the hearing, Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

Dated this 6th day of November, 2012.

>	*/s/ Richard F. Cebull*_____
>	Richard F. Cebull
>	United States District Judge